

BLACKHAWK MOLDING CO., INC.,    )
   )
   Plaintiff, Counter-Defendant,    )
   )
           v.    )    **No. 03 C 6060**
   )    **Judge Joan H. Lefkow**
PORTOLA PACKAGING, INC.,    )
   )
   Defendant, Counter-Plaintiff.    )

## MEMORANDUM OPINION AND ORDER

Plaintiff Blackhawk Molding Co., Inc. ("Blackhawk") filed this patent infringement action against defendant, Portola Packaging, Inc. ("Portola"), asserting that Portola's sales of "5-Gallon Non-Spill Snap Caps" with "optional single-stick labels" (the "Accused Product") infringe Blackhawk's U.S. Patent 5,904,259 ("the '259 patent"). In response, Portola asserted counterclaims against Blackhawk, seeking a declaratory judgment that Portola does not infringe the '259 patent (counterclaim I) and a declaratory judgment that the '259 patent is unenforceable (counterclaims V and VI) and invalid under 35 U.S.C. §§ 102, 103, and 112 (counterclaims II, III, and IV). Before the court are the parties' cross-motions for summary judgment on infringement and Portola's counterclaim based on inequitable conduct, Portola's motion for summary judgment on invalidity, and Blackhawk's motion (1) to strike Portola's reply submissions, or in the alternative, for leave to file sur-reply briefs and responses to Portola's Amended Statement of Material Facts, and (2) to have certain facts deemed admitted. For the reasons stated below, the court grants in part and denies in part Blackhawk's motion to strike, grants Blackhawk's motion for summary judgment on infringement, grants Blackhawk's motion for summary judgment on Portola's defense and

counterclaim based on inequitable conduct, and denies Portola's motion for summary judgment on infringement, invalidity, and unenforceability.

## SUMMARY JUDGMENT STANDARDS

Summary judgment obviates the need for a trial where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). To determine whether any genuine fact exists, the court must pierce the pleadings and assess the proof as presented in depositions, answers to interrogatories, admissions, and affidavits that are part of the record. Fed R. Civ. P. 56(c) Advisory Committee's notes. The party seeking summary judgment bears the initial burden of proving there is no genuine issue of material fact. *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 323, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986). In response, the nonmoving party cannot rest on bare pleadings alone but must use the evidentiary tools listed above to designate specific material facts showing that there is a genuine issue for trial. *Id.* at 324; *Insolia* v. *Philip Morris Inc.*, 216 F.3d 596, 598 (7th Cir. 2000). A material fact must be outcome determinative under the governing law. *Insolia*, 216 F.3d at 598-99. Although a bare contention that an issue of fact exists is insufficient to create a factual dispute, *Bellaver* v. *Quanex Corp.*, 200 F.3d 485, 492 (7th Cir. 2000), the court must construe all facts in a light most favorable to the nonmoving party as well as view all reasonable inferences in that party's favor. *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 255, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986).

In a patent infringement action, an accused infringer seeking summary judgment of noninfringement may meet its initial burden by providing evidence that would preclude a finding of infringement or by showing that the evidence fails to establish a material issue of fact essential to the patentee's case. *Vivid Techs.* v. *Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 807 (Fed. Cir. 1999). A

court may grant summary judgment of noninfringement if, after viewing the alleged facts in the light most favorable to the patentee and drawing all reasonable inferences in the patentee's favor, there is no genuine issue as to whether the patent claims encompass the accused device. *Novartis Corp.* v. *Ben Venue Labs.*, 271 F.3d 1043, 1046 (Fed. Cir. 2001).

## I.    MOTION TO STRIKE

Before reaching the substantive arguments of both parties, the court will address Blackhawk's motion to strike Portola's reply submissions and to have certain facts deemed admitted. Portola submitted an amended statement of material facts with its reply to Blackhawk's response to Portola's motion for summary judgment. The amended statement of material facts included twenty-five additional facts, none of which were disclosed in its original Local Rule 56.1 statement of material facts.

Contrary to Portola's assertion, Local Rule 56.1 does not contemplate a statement of additional facts from the movant. *See, e.g., Carter* v. *Finley Hospital*, No. 01 C 50468, 2003 WL 22287392, at * 1 (N.D. Ill. Sep. 30, 2003) (striking the additional facts submitted by the movant for summary judgment with its reply to the non-movant's statement of additional facts and stating, "The moving party has the responsibility of asserting all facts relied upon in its opening statement of facts under Local Rule 56.1(a)."). Portola's additional facts are tardy. If they were material to the grant of summary judgment, they belonged in Portola's Local Rule 56(a)(3) statement. Moreover, if the court were to permit a movant to file a statement of additional facts in response to a non-movant's statement additional facts, it would be obliged to allow the non-movant to respond, creating a hall of mirrors that would hardly facilitate an efficient resolution of the issues. Blackhawk's motion to strike Portola's additional facts is granted. Because the court has granted Blackhawk's motion to

3

strike the court will not consider Blackhawk's sur-reply briefs or its responses to Portola's additional facts.

The court, in its discretion, denies Blackhawk's motion to strike and deem admitted certain facts in its various Local Rule 56.1 statements because of Portola's failure to comply strictly with the dictates of the local rules. While most of Blackhawk's arguments are well-taken, the court notes with dismay Blackhawk's own failure to comply with Local Rule 56.1. For example, in paragraph 7 of its Local Rule 56.1 statement of material facts relating to infringement and invalidity, Blackhawk cites generally to exhibit E1, which is a sixteen-paged letter, without specifically referencing the line, paragraph, or even page number that contains evidence in support of the asserted fact. *See Malec* v. *Sanford*, 191 F.R.D. 581 (N.D. Ill. 2000) ("'[S]pecific reference' means including proper Bluebook citations to exact pieces of the record that support the factual contention contained in the paragraph. In other words, citations must include page (or paragraph) numbers, as opposed to simply citing an entire deposition, affidavit, or other exhibit document ...."). In paragraph 9, Blackhawk failed to cite to any exhibit in support of its asserted fact.

Compliance with the local rules is not a mere technicality. *Ammons* v. *Aramark Uniform Servs., Inc.*, 368 F.3d 809, 817 (7th Cir. 2004) ("We have also repeatedly held that a district court is entitled to expect strict compliance with Rule 56.1."). Yet, in this instance, sauce for the goose is sauce for the gander, and the court will not undertake to examine each asserted fact for strict compliance with the local rules.

Nonetheless, "[d]istrict courts are not obliged in our adversary system to scour the record looking for factual disputes." *Waldridge* v. *Am. Hoechst Corp.*, 24 F.3d 918, 922 (7th Cir. 1994). Therefore, in deciding whether genuine issues of material fact exist, the court will only consider the

4

facts to the extent they are supported by the evidence to which they cite, and will not consider the legal arguments or conclusions asserted by both parties in their various statements of material and additional facts. Additionally, the failure to cite to evidence in opposition to a stated fact may result in the court deeming the substance of the stated fact admitted if the party opposing the stated fact has failed to identify contradictory evidence in its briefs or its own statement of facts.

## II.    BACKGROUND

Blackhawk is the holder of the '259 patent, which was issued on May 18, 1999. The '259 patent relates to a peelable label found on the caps of five-gallon water bottles that are inverted and placed onto water coolers. The caps have a built-in valve that allows the user to keep the cap on the water bottle when placing it on the water cooler. The water cooler has an upwardly directed probe inside its upper end, which penetrates the cap on the bottle and activates a valve inside the cap, allowing water to flow from the bottle. The opening of the bottle cap is protected by a label, which the user peels off the bottle before placing the bottle onto the water cooler. The label, which is disclosed in the '259 patent, has no adhesive, thereby preventing anyone from replacing the label on the bottle once it has been pulled away from the cap or sticking the label onto the side of the bottle.

## III.   CLAIM CONSTRUCTION ORDER

On September 1, 2004, the court entered an order issuing its *Markman* rulings on the disputed claims of the '259 patent. *See* Docket #42. Blackhawk and Portola now offer competing interpretations of this order with regard to claims 1 and 7 of the '259 patent: "said seal being formed by a plastic, non-metallic tamper-indicating membrane attached to a top face of said cap by a heat seal band which evidences tampering with said seal in the event of an attempt to remove said seal." Based on its reading of the order, Portola argues that the membrane is merely a layer in an otherwise

5

multi-layered label. Blackhawk argues to the contrary that the membrane is the label and that the label is comprised of multiple integrated layers, each of which is plastic and non-metallic. Blackhawk has interpreted the court's order correctly.

The court accepted Blackhawk's construction of claim 1, limitation C, and claim 3, limitation J, including Blackhawk's definition of "membrane," which it defined as "a thin, soft pliable sheet or layer." *See Markman* Order; Joint Claim Construction Chart at 1 [Docket #16]. In accepting Blackhawk's definition, the court implicitly rejected Portola's definition of "a plastic, non-metallic tamper-indicating membrane" as "[t]he portion of the seal that directly attaches to the top face of the cap being a *single* non-metallic layer of plastic material." *See id.* (emphasis added). The court further ruled that the membrane serves as a label and the label has printed information on it. *Id.* Thus, the "membrane" is the label in its entirety, not merely the bottommost part of the label or the sealing layer. This interpretation gives "membrane" its ordinary meaning, which is apparent when read in the context of the patent specification.

The court recognizes that its rejection of "single" as "superfluous" from the text of Portola's proposed construction of claim 1, limitation D and claim 7, limitation L was imprecise. Portola's inclusion of "single" in proposed construction limitation D was at odds with the court's acceptance of Blackhawk's proposed construction of limitation C, including its definition of "membrane," and the court's construction of claim 1, limitation E and claim 7, limitation K, that the "membrane" serves as a "label." Rather than being "superfluous," Portola's use of "single" conveyed inaccurately that the membrane was limited to the base layer of the label. This should be apparent from the text of footnote 4: "Again the only apparent difference [between the parties] is whether there can be but a single layer of non-metallic plastic material attached to the toop face of the cap. The parties agree

6

that the membrane must be attached to the top face of the cap, but the limitation does not exclude layers above that membrane."

## IV.    INFRINGEMENT ANALYSIS

A patent infringement analysis involves a two-step process in which the court first construes the scope and claims of the patent claims asserted. *Vitronics Corp.v. Conceptronic, Inc.*, 90 F.3d 1576, 1581-82 (Fed. Cir. 1996), *citing Markman* v. *Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995), *aff'd* 517 U.S. 370, 134 L. Ed. 2d 577, 116 S. Ct. 1384 (1996). Rather than repeat its rulings on claim construction here, the court refers the parties to its *Markman* order. [Docket # 42]. The fact finder then compares the properly construed claims to the accused product. *Cybor Corp.* v. *FAS Techs., Inc.*, 138 F.3d 1448, 1454 (Fed. Cir. 1998) (*en banc*). Unless every limitation of a patent claim is found in the accused product, there can be no literal infringement. *See, e.g., Laitram Corp.* v. *Rexnord, Inc.*, 939 F.2d 1533, 1535 (Fed. Cir. 1991). Blackhawk asserts that Portola is infringing the '259 patent's two independent claims (claims 1 and 7) and claims 2, 3, and 5 depending from claim 1, and claims 8, 10, 12, 14, and 15 depending from claim 7. The court will address each claim in turn.

### A.    Limitation A[1]

Claim 1 and its dependent claims call for "an improved bottle cap for a container, the cap having a central tube section capable of receiving a probe which is part of a dispensing system." Local Rule 56.1(a)(3)(B) Statement of Material Facts Relating to Blackhawk's Motion for Summary Judgment of Infringement ("BSF Infringement") ¶ 10. The Accused Product is a bottle cap for a container that has a central tube section and is capable of receiving a probe which is part of a

---

[1] The court notes for clarity purposes that it is using the same lettering system as in its Markman Order.

dispensing system. BSF Infringement ¶¶ 11-13. Thus, Limitation A is present in the Accused Product.

## B.     Limitation B

Claim 1 and its dependent claims call for "a seal preventing external contaminants from reaching said central tube section and said container through said central tube section when said cap is applied to said container." BSF Infringement ¶ 14. The Accused Product has a seal that covers the central tube section. BSF Infringement ¶¶ 15-16. Portola's specifications for its label state that it "will act as a contamination barrier," "must form an adequate seal to prevent contamination and not be partially removed during shipping[,] customer storage and end customer use," and "[t]he label is easily removable by the consumer, while maintaining its integrity during shipping, handling, and closure application to the bottle." BSF Infringement ¶¶ 17-19. Therefore, Limitation B is present in the Accused Product.

## C.     Limitation C

Claim 1 and its dependent claims call for "said seal being formed by a plastic, non-metallic tamper-indicating membrane . . . ." BSF Infringement ¶ 20. Portola's label specifications likewise state that its "label material is generically a thin, plastic film structure with a printable polyester layer backed by a polyethylene layer capable of conduction sealing to LDPE or LLDPE closures." BSF Infringement ¶21. Thus, the Accused Product embodies a label, which is a plastic, non-metallic membrane.

Further, the claim recites that the seal is "attached to a top face of said cap by a heat seal band which evidences tampering with said seal in the event of an attempt to remove said seal." Portola's "optional single stick label is applied to a 5-gallon non-spill cap by conduction heating,

8

namely, by applying heat and pressure to a portion of the label to fuse the portion of the label to a top surface of the cap." BSF Infringement ¶ 23. Additionally, Portola's specifications for its single stick label state that "it is anticipated that this film could be applied by heating the circumference of the film to melt it to the closure, forming a seal to prevent contamination." BSF Infringment ¶ 25. Portola's label is attached to the top of the cap by a "circular heat seal area."[2] BSF Infringement ¶ 27. Portola's labels are "NOT intended to be reapplied to the closure once removed." BSF Infringement ¶ 41. Portola has also advertised that "[a]lthough some of your customers might get creative, most won't be able to stick this label onto the bottle." BSF Infringement ¶ 31. Thus, the Accused Product embodies Limitation C in that the label is attached to the top of a cap by a circular seal area and the label indicates tampering because it is not capable of being reattached.

Portola argues, however, that the Accused Product does not infringe any asserted claim of the '259 patent because Portola uses materials and methods that were taught in the prior art Yoshida patent and which Blackhawk disavowed. The court rejects both arguments.

First, there is no "practicing the prior art" defense to literal infringement. *See Baxter Healthcare Corp. v. Spetramed, Inc.*, 49 F.3d 1575, 1583 (Fed. Cir. 1995) ("There is no requirement that the accused device be nonobvious in light of prior art, or otherwise be itself patentable. Literal infringement exists if each of the limitations of the asserted claim(s) read on, that is, are found in, the accused device."). Literal infringement, instead, is determined by construing the claims and

---

[2] Portola objects to the facts stated in BSF Infringement ¶ 27 as imprecise, stating that the modified polyethylene membrane of Portola's device adheres to the polyethylene surface of the bottle cap as taught by Yoshida. The court understands that Portola is arguing that it practices the methods taught by Yoshida, but that argument does not explain or refute the information contained on the Standardized Work Instruction Sheet, which established the elements of operation for the Accused Product. *See* Exhibit G in support of Blackhawk's motion for summary judgment of infringement. This exhibit provides the specification that the "[h]eat seal label must seal 360 degrees except over gate area." The exhibit also depicts the method of verifying that the heat seal label seals 360 degrees by sliding a Starrett steel ruler under the label, following the "circular heat seal area."

comparing them to the accused device, not the prior art. *Id. See also Tate Access Floors, Inc.* v. *Interface Architectural Res., Inc.*, 279 F.3d 1357 at 1369 (Fed. Cir. 2004) ("[I]f possible, claims are construed to preserve validity. It certainly announces no general rule that 'practicing prior art' is an affirmative defense precluding literal infringement.").

Second, Blackhawk has not disavowed the heat sealing method of attachment. During its prosecution of the '259 patent, Blackhawk distinguished the '259 patent from the Yoshida patent:

> The examiner cites column 5, lines 13-14 of the Yoshida patent as teaching the label materials and attachment means of the present invention. However, careful review of this section of the Yoshida patent reveals that the attachment means taught by Yoshida would not produce a cap having the tamper evident features of the claimed invention. Specifically, lines 29-32 of column 5 of Yoshida teach that "the film 5 is made to have a peripheral portion provided with <u>hot-melt resin or adhesive</u> which is thermally fused for attachment to the rim member 6." In contrast, the amended independent claims of the present application explicitly state that the label of the claimed invention is free from adhesive such that the label is non-reattachable to an outside surface of a container to the top face of the cap.
>
> If one were to attach a label to a cap using the hot-melt resin or adhesive suggested by Yoshida, the stickiness of the hot melt resin or adhesive would allow the label to be placed back on the cap after the container has been tampered with.

Amendment and Response to Office Action, Portola Ex. 6 at P1003 (emphasis in original). This statement does not disavow the heat sealing technique. *See Gemstar-TV Guide Int'l, Inc.* v. *Int'l Trade Comm'n*, 383 F.3d 1352, 1364 (Fed. Cir. 2004) ("The presumption of ordinary meaning will be rebutted if the inventor has disavowed or disclaimed scope of coverage, by using words or expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope.") (internal quotations and citation omitted). Instead, the statement reveals that two limitations of the '259 patent, its tamper evident feature and a membrane free of adhesives such that the label is non-reattachable, are not found in Yoshida.

Portola also argues that Blackhawk distinguished the '259 patent from the Yoshida patent

a second time during the prosecution of the '259 patent in the following statement: "Applicants have made certain amendments to the above-identified Application which are believed to render moot the Petition to Institute a Public Use Proceeding." Again, this ambiguous statement fails to disavow any portion of the claim scope. Moreover, the statement refers to the Liqui-Box closure, which was the subject of the Public Use Proceeding, and was not directed to the Yoshida patent.

Third, Portola's proposed claim construction would exclude the preferred embodiment of the '259 patent in that it would exclude heat seal labels. "A claim interpretation that excludes a preferred embodiment from the scope of the claim is rarely, if ever, correct." *On-Line Techs., Inc., v. Bodenseewerk Perkin-Elmer GmbH*, 386 F.3d 1133, 1138 (Fed. Cir. 2004) (citations and internal quotations omitted).

### D.     Limitation D

Claim 1, Limitation D specifies that "said tamper-indicating membrane being free of adhesive such that it is not reattachable to an outside surface of said container and to said top face of said cap." The Accused Product embodies Limitation D, as Portola has admitted repeatedly that its single stick labels are not attached to the cap with glues or adhesives. *See* BSF Infringement ¶¶ 33, 34, 36, 37, 38, 40. Additionally, a "key characteristic" of Portola's single stick labels is that the labels are not intended to be reapplied to the closure once removed. BSF Infringement ¶ 41.

### E.     Infringement of Claims 2, 3, 5, 7, 8, 10, and 12

Claim 2, Limitation E requires that "the membrane serves as a label and the label has printed information on it." *See Markman* Order. The label on the Accused Product embodies Limitation

11

E as it contains printed information. BSF Infringement ¶¶ 44-45.[3] Having rejected Portola's argument that the claims require that the portion of the label that is attached directly to the cap contain printing, the court finds that Portola has admitted that the Accused Product embodies claims 3, 5, 7, 8, 10, and 12. *See* BSF Infringement ¶¶ 46-49, 50, 52, 53-67, 69, 71-72, 75, 77-96, 98-104.

## F.    Infringement of Claims 14 and 15[4]

Claim 14, Limitation P requires that "at least a portion of a peripheral edge of said label remains unattached to said cap, and said top face of the cap has a raised portion for deflecting an edge of said label upward to facilitate grasping of said label." BSF Infringement ¶ 105. The Accused Product has a circumferential ridge on the top of the cap. BSF Infringement ¶ 107. The Accused Product has a tab, which extends outside of the circumferential ridge.[5] BSF Infringement ¶ 108. Therefore, the Accused Product embodies claim 14, limitation P.

Claim 15, limitation Q, states that "said portion is a circumferential bead extending in a substantially continuous ring about said face." BSF Infringement ¶ 110. Claim 15, limitation R, calls for "said bead defecting at least a portion of said label in an upward direction away from said top face of said cap. BSF Infringement ¶ 112. The Accused Product has a continuous, ring-shaped ridge on the top of the cap and a bead that is raised in an upward direction from the top face of the

---

[3]Portola objects to BSF Infringement ¶ 44 as imprecise, stating that the Accused Product "contains a membrane, other than the bottom modified polyethylene membrane directly attached to the bottle cap, that contains printed information." The court's claim construction, however, has resolved this dispute. *See, supra*, Part III Claim Construction Order.

[4]With respect to Limitations P, Q, and R, the Accused Product does not include the NS99 series of caps.

[5]Inexplicably, Portola disputes the fact stated in BSF ¶ 108. Exhibit G, the Standardized Work Instruction Sheet for the Accused Product, discusses a label tab, specifying the area in which the tab must fall. Additionally, the court's examination of Exhibit C, a bottle cap with its label, shows that the label includes a tab, which states "LIFT TO REMOVE," extending beyond the "top of ridge." Because Portola has failed to identify any contradictory evidence, the court strike's Portola's response and deems admitted the facts asserted in BSF ¶ 108.

cap. BSF Infringement ¶¶ 111, 113.[6] Thus, the Accused Product embodies claims 14 and 15.

Because the Accused Product satisfies every element of the '259 patent, it literally infringes the '259 patent. Accordingly, Blackhawk's motion for summary judgment on infringement is granted; Portola's motion for summary judgement for non-infringement is denied.

## V.    VALIDITY OF THE '259 PATENT

The court now turns to Portola's arguments regarding the invalidity of the '259 patent. A patent is invalid for obviousness if "differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." 35 U.S.C. § 103(a). To establish that particular claims are invalid, the presumption of validity in 35 U.S.C. § 282 must be overcome by clear and convincing evidence. *State Contracting & Eng'g Corp. v. Condotte Am., Inc.*, 346 F.3d 1057, 1067 (Fed. Cir. 2003). Additionally, as recognized by Blackhawk, Portola has a particularly onerous burden in overcoming the presumption of the validity of the '259 patent because Portola brought the prior art on which it relies for its invalidity arguments to the attention of the Patent and Trademark Office examiner. *See McGinley* v. *Franklin Sports, Inc.*, 262 F.3d 1339, 1353 (Fed. Cir. 2001), *quoting Am. Hoist & Derrick Co.* v. *Sowa & Sons, Inc.*, 725 F.2d 1350, 1359, (Fed. Cir. 1984), *cert. denied*, 469 U.S. 821, 105 S. Ct. 95, 83 L. Ed. 2d 41 (1984) ("When no prior art other than that which was considered by the PTO examiner is relied on by the attacker, he has the added burden of overcoming the deference that is due to a qualified government agency presumed to have properly done its job . . . ."). Relying on its erroneous interpretation of the

---

[6]Again, Portola disputes the fact stated in BSF Infringement ¶ 113. The court's examination of Exhibit C shows, however, that the Accused Product has a bead, or tab, which is directed away from the top face of the cap. Accordingly, the court strikes Portola's response and deems admitted the facts asserted in BSF Infringement ¶ 113.

court's *Markman* Order, Portola argues that under the court's claim construction, claim 1 of the '259 patent is invalid because it was anticipated by the Liqui-Box cap and rendered obvious by the Clear Lam label.

## A. The Liqui-Box Cap

"A patent is invalid as anticipated if every limitation in a claim is found in a single prior art reference." *Nystron* v. *Trex Co.*, 424 F.3d 1136 at 1149 (Fed. Cir. 2005), *citing Teleflex, Inc.* v. *Ficosa N. Am. Corp.*, 299 F.3d 1313, 1335 (Fed. Cir. 2002) ("[A]nticipation requires that each limitation of a claim must be found in a single reference"). In this case, as the court has explained, the "membrane" is the entire "label," not merely a single layer that attaches to the top face of the cap. Each layer of the membrane must be plastic and non-metallic. The Liqui-Box cap, however, embodies a metallic, or foil, dust cover. Blackhawk's Local Rule 56.1(b)(3)(B) Statement of Additional Facts in Opposition that Require the Denial of Portola's Motion for Summary Judgment of Non-Infringement and Invalidity at ("BSAF Infringement") ¶ 35. Therefore, the Liqui-Box cap does not embody limitation C of claim 1 of the '259 patent, which calls for a plastic, non-metallic membrane. Accordingly, claim 1 of the '259 patent was not anticipated by the Liqui-Box cap.

## B. The Clear Lam Label

Portola also argues that claim 1 was made obvious by the Clear Lam label, which Portola argues constitutes prior art under 35 U.S.C. § 102(b). According to Portola, Clear Lam Packaging, Inc. sold and offered for sale in the United States a label for use on a water bottle cap ("the Clear Lam label"). Portola's Statement of Material Facts in Support of its Motion for Summary Judgment

of Invalidity, Non-Infringement, and Inequitable Conduct ("PSF Invalidity") ¶ 16.[7] Portola asserts that three events involving Clear Lam invalidate the '259 patent: (1) a 1993 sale of printed labels from Clear Lam to Blackhawk; (2) a 1993 offer to sell 55,000,000 printed labels from Clear Lam to Blackhawk; and (3) a 1995 offer to sell unprinted labels from Clear Lam to Blackhawk.[8]

Section 102(b) of the Patent Act provides that no person is entitled to patent an "invention" that has been on sale more than one year prior to filing a patent application. 35 U.S.C. § 102(b). The "on-sale bar" applies when two conditions are satisfied before the critical date: (1) the product must be the subject of a commercial offer for sale; and (2) the invention must be ready for patenting. *Pfaff* v. *Wells Electronics, Inc.*, 525 U.S. 55, 67, 142 L. Ed. 2d 261, 119 S. Ct. 304 (1998). Even a single offer is sufficient to invalidate the patents. *Id.* An accused infringer may overcome a patent's presumption of validity by presenting clear and convincing evidence of facts showing that the

---

[7]Notably, Portola fails to engage in any examination of the language of the 1993 preliminary price quote or the March 1995 price quote in either its memorandum in support of its motion for summary judgment on invalidity and infringement or its Local Rule 56.1 Statement of Material Facts, choosing instead to assert summarily that the Clear Lam label was sold and offered for sale more than one year prior to filing of the '259 patent. *See* PSF Invalidity ¶ 16 and Portola's Memorandum at 5. The assertion is a legal conclusion rather than a material fact. *See Tec Air Inc. v. Denso Mfg. Michigan Inc.*, 192 F.3d 1353 (Fed. Cir. 1999) ("The ultimate determination that a product was placed on sale under 35 U.S.C. § 102(b) (1994) is a question of law, based on underlying facts.") (quotations and citation omitted). As a result, PSF Invalidity ¶ 16 is improper. *See Malec*, 191 F.R.D. at 583 ("[A] movant's 56.1(a) statement should contain *only* factual allegations. It is inappropriate to allege legal conclusions in a 56.1(a) statement on the off-chance that one's opponent might not file a correct response.") (emphasis in original). The same analysis applies to the legal conclusions asserted in PSF Invalidity ¶ 34 ("offered to sell"). It is even arguable that plaintiff waived this claim by failing to address or develop it adequately in its opening brief. *See 330 West Hubbard Restaurant Corp.* v. *United States*, 203 F.3d 990, 997 (7th Cir. 2000) ("A party's failure to address or develop a claim in its opening brief constitutes a waiver of that claim, for it is not the obligation of this court to research and construct the legal arguments open to the parties, especially when they are represented by counsel. . . . In order to develop a legal argument effectively, the facts at issue must be bolstered by relevant legal authority; a perfunctory and undeveloped assertion is inadequate to raise a separate basis for appeal.") (internal citations and quotations omitted). Because Portola has failed to demonstrate that no genuine issue of material fact exists with regard to its claim of invalidity, the court will forego denying Portola's motion for summary judgment on these procedural grounds alone.

[8]Portola also fails to mention the 1995 "price quotation" in its Local Rule 56.1 Statement of Material Facts, waiting until its reply brief to assert this letter as an event that invalidated the '259 patent. As such, Portola waives any argument that the 1995 "price quotation" was a commercial offer for sale. Again, however, the court will consider the merits of this issue.

patented device was on sale before the critical date. *Massey* v. *Del Labs., Inc.*, 118 F.3d 1568, 1573 (Fed. Cir. 1997). Both prongs must be proven by this standard and must occur before the critical date. *See EZ Dock, Inc.* v. *Schafer Sys., Inc.*, 276 F.3d 1347, 1351 (Fed. Cir. 2002).

To satisfy the first condition as stated in *Pfaff*, Portola "must demonstrate by clear and convincing evidence that there was a definite sale or offer to sell more than one year before the application for the subject patent, and that the subject matter of the sale or offer to sell fully anticipated the claimed invention or would have rendered the claimed invention obvious by its addition to prior art." *See STX, L.L.C.* v. *Brine, Inc.*, 211 F.3d 588, 590 (Fed. Cir. 2000) (quotation and citation omitted); *Vanmoor* v. *Wal-Street Stores, Inc.*, 201 F.3d 1363, 1366 (Fed. Cir. 2000) (stating that invalidating sale must involve device that "actually embodied or rendered obvious the patented invention"), *quoting Evans Cooling Sys., Inc.* v. *General Motors Corp.*, 125 F.3d 1448, 1451 (Fed. Cir. 1997). Generally, the court's first inquiry in its § 102(b) analysis is whether the subject of the barring activity met each of the limitations of the claim, and thus was an embodiment of the claimed invention. *See Scaltech Inc.* v. *Retec/Tetra, L.L.C.*, 178 F.3d 1378, 1383 (Fed. Cir. 1999). In this case, however, the court finds it more expeditious to first assess whether experimental use negates the sales that were made, as "adequate proof of experimentation negates a statutory bar." *Allen Engineering Co.* v. *Bartell Indus., Inc.*, 299 F.3d 1336 at 1353 (Fed. Cir. 2002), *quoting EZ Dock*, 276 F.3d at 1357. In determining whether a transaction was primarily for purposes of experimentation, the court has considered a number of factors, not all of which may apply in any particular case, including:

> (1) the necessity for public testing, (2) the amount of control over the experiment retained by the inventor, (3) the nature of the transaction, (4) the length of the test period, (5) whether payment was made, (6) whether there was a secrecy obligation, (7) whether records of the experiment were kept, (8) who conducted the experiment,

. . . (9) the degree of commercial exploitation during testing[,] . . .(10) whether the invention reasonably requires evaluation under actual conditions of use, (11) whether testing was systematically performed, (12) whether the inventor continually monitored the invention during testing, and (13) the nature of contacts made with potential customers.

*Id.*

## 1. 1993 Purchase of Clear Lam Labels

In this case, the record shows that Blackhawk purchased a small quantity of labels from Clear Lam in 1993. BSAF Infringement ¶ 50. Blackhawk did not intend to use these labels on bottle caps that were to be sold to the public. BSAF Infringement ¶ 51. The labels were made by Clear Lam according to Blackhawk's confidential specifications. BSAF Infringement ¶ 60. Blackhawk required Clear Lam to agree that it would keep confidential its work on a heat sealed label for valved five gallon caps, and Blackhawk's dealings with Clear Lam were confidential. BSAF Infringement ¶¶ 57-58.[9] Blackhawk was neither attempting to commercialize the invention nor did it place the invention into the public domain. In fact, at the time of this purchase, Blackhawk did not yet have a machine for applying the label. BSAF Infringement ¶ 52. Blackhawk divided the labels that it had purchased from Clear Lam, sending some to BWI Fords Holmatic, a heat sealing machine supplier, so that BWI could assist Blackhawk in the development of a heat sealing machine to apply the labels to caps. BSAF Infringement ¶ 54-55. Blackhawk also kept some of the labels for use at its own facility for work in developing the details of how to apply a heat sealed label to a five gallon cap.

---

[9]Portola disputes the facts stated in BSAF Infringement ¶¶ 52,53, 58-60 as unsupported by the evidence; however, the evidence cited by Blackhawk in as evidence of the asserted facts in these paragraphs supports the facts stated in that paragraph exactly. Additionally, Portola argues that the facts stated in BSAF Infringement ¶¶ 54-55 are inconsistent with ¶ 53. The court disagrees. Not only are the fact consistent, they are supported by the evidence. The court also declines to consider the additional, unsupported factual assertion by Portola that the BWI machine was built as a commercial embodiment. *See Malec*, 191 F.R.D. at 584 (emphasizing that Rule 56.1(b)(3)(B) provides the *only* acceptable means of . . . presenting additional facts") (emphasis in original) (citation omitted).

*Id.* Given this background, there is a genuine issue of material fact as to whether Blackhawk's purchase of the labels was incidental to its experimentation.

2. Price Quotations of March 11, 1993 and March 1, 1995

Portola also has failed to establish that the "preliminary price quotation" of March 11, 1993 and the "price quotation" of March 1, 1995 were "commercial offers for sale" under the first prong of *Pfaff*. Under Federal Circuit law, "only an offer which rises to a level of a commercial offer for sale, one which the party could make into a binding contract by simple acceptance (assuming consideration) constitutes an 'offer for sale,'" for purposes of the on-sale bar to patentability. *Group One, Ltd.* v. *Hallmark Cards, Inc.*, 254 F.3d 1041 at 1048 (Fed. Cir. 2001) (stating that the Federal Circuit looks to the Uniform Commercial Code to define whether a communication rises to the level of a commercial offer for sale). The Federal Circuit counseled that "[i]n any given circumstance, who is the offeror, and what constitutes a definite offer, requires looking closely at the language of the proposal itself. Language suggesting a legal offer, such as 'I offer' or 'I promise,' can be contrasted with language suggesting more preliminary negotiations, such as 'I quote' or 'Are you interested.'" *Id.*

Because the Uniform Commercial Code does not define "offer," courts must look to extra-Code contract law to determine whether a party has made an offer. *See* 1 JAMES J. WHITE & ROBERT S. SUMMERS, UNIFORM COMMERCIAL CODE § 1-4 (4th ed. 2005). As a consequence, the Federal Circuit has recognized that "there is a substantial body of general contract law, widely shared by both state and federal courts, to which courts can resort in making these determinations." *Group One*, 254 F.3d at 1048. Such authority includes the RESTATEMENT (SECOND OF CONTRACTS), which defines an "offer" as a "manifestation of willingness to enter into a bargain, so made as to justify another

18

person in understanding that his assent to that bargain is invited and will conclude it." *Id.* at § 24. Another authority states that "the best short description . . . is than an offer creates the power of acceptance in the offeree." ARTHUR LINTON CORBIN, CORBIN ON CONTRACTS § 1.11 (1964).

A close examination of the 1993 "preliminary price quotation" reveals language suggesting preliminary negotiations rather than a legal offer. The letter states, "Enclosed is a *preliminary* price quotation for your 'Safeguard Cap' program lidding. These prices are *pending review* or the number of items and colors, as well as quantities of individual items." Portola's Exhibit 19 at CL00058 (emphasis added). The proposed quantities were based on estimates. *Id.* Additionally, the letter expressly noted that the web width and cutoff were estimates that might change with the final machine specifications and that the various color combinations and quantities needed to be finalized. *Id.* The language of this letter invites discussion and negotiations rather than presenting definite terms that Blackhawk could accept to create a binding contract. *See* CORBIN ON CONTRACTS § 1.11 ("In order to be legally operative and to create a power of acceptance, it is necessary that the offer shall contain all the terms of the contract to be made."); WILLISTON ON CONTRACTS § 3.3 ("[A]n offer must state with the same certainty the act or promise which the offeror agrees to take in return for his promise if the offeree accepts."); FARNSWORTH ON CONTRACTS § 3.3 ("The fact that a proposal is very detailed suggests that it is an offer, while omission of many terms suggests that it is not."). Thus, the 1993 letter was not a "commercial offer for sale" for purposes of the on-sale bar.

Similarly, the March 1, 1995 letter presented a "price quotation for [Blackhawk's] review" and stated, "We look forward to discussing these prices with you." Portola's Exhibit 19 at CL00009. Even assuming that the subject of this price quotation, the rolls of unprinted labels, embodied each of the limitations of claim 1 of the '259 patent, Portola has not demonstrated that the price quotation

contained language indicating that an offer was being made or including definite terms, such as the time of delivery or terms of payment. *See* Lawrence Anderson on the Uniform Commercial Code § 2-206:20 (summarizing a case that held that "[a] letter from a seller was not an offer which could be accepted when it stated that it was a 'price quotation' and stated that specified goods were available at specified prices, but did not contain any language indicating that an offer was being made, or contain any statement of quantity, time of delivery, or terms of payment.") (footnote omitted). It is also unclear to the court whether this price quotation specified any quantity. The letter mentions that two rolls at 1,000 feet each would be produced at "no charge." The letter also states, "Your PO #R7237 will be held until we reach a decision regarding the 5,000 foot sample roll (cost of $125.00)." The letter also lists various quantities at various prices. Neither party offers evidence explaining what any of this means, but it suggests that no decision had yet been reached as to the quantity. In any event, Portola has not established that the 1995 "price quotation" was a commercial offer for sale for purposes of the on-sale bar.

Because Portola has failed to demonstrate that there are no genuine issues of material fact with regard to the first *Pfaff* prong, the court finds it unnecessary to address the second *Pfaff* prong, whether the invention was "ready for patenting" and Portola's argument that the Clear Lam label rendered obvious claim 1 of the '259 patent. For clarity, the court also notes that it made no finding as to whether the Clear Lam labels sold in 1993 disclosed each limitation of the '259 patent. Portola's motion for summary judgment on invalidity is therefore denied.

## VI.    CONDUCT OF BLACKHAWK

Finally, the court turns to the parties' cross-motions for summary judgment on Portola's defense based on inequitable conduct. "In order to prove inequitable conduct in the prosecution of

a patent, [the defendant] must have provided evidence of affirmative misrepresentations of a material fact, failure to disclose material information, or submission of false material information, coupled with an intent to deceive." *Dayco Prods., Inc.* v. *Total Containment, Inc.*, 329 F.3d 1358, 1362 (Fed. Cir. 2003) (citations omitted). There are two steps to a determination of inequitable conduct: (1) the accused infringer must prove by clear and convincing evidence that the information withheld from the U.S. Patent and Trademark Office ("PTO") was material; and (2) the accused infringer must prove by clear and convincing evidence that the patentee intended to mislead the PTO. *Brasseler, U.S.A. I, L.P.* v. *Stryker Sales Corp.*, 267 F.3d 1370, 1379 (Fed. Cir. 2001). Materiality and intent are factual determinations. *Id.* Thus, to survive summary judgment, Portola must introduce evidence from which a trier of fact could find materiality and intent by clear and convincing evidence. *Abbot Labs.* v. *TorPharm, Inc.*, 300 F.3d 1367, 1379 (Fed. Cir. 2002). Once the threshold levels of materiality and intent are established, the court must weigh materiality and intent to determine whether the equities warrant a conclusion that inequitable conduct occurred. *Molins PLC* v. *Textron, Inc.*, 48 F.3d 1172, 1178 (Fed. Cir. 1995). Having considered the evidence and arguments submitted by both parties on their cross-motions for summary judgment on Portola's defense and counterclaim of inequitable conduct and in the absence of a genuine issue of material fact, the court finds that Portola has failed to introduce sufficient evidence from which a reasonable trier of fact could find that the elements of inequitable conduct has been established.

Portola has identified five statements made by Blackhawk's counsel, Richard Roche, during the prosecution of the '259 patent that it asserts were false and made intentionally and with reckless disregard for their veracity. These statements were included in the March 18, 1998 response of Blackhawk to the PTO Examiner's initial rejection of Blackhawk's patent application and related

21

to the Yoshida patent and the Liqui-Box product. Blackhawk does not dispute that these statements were made to the PTO. Therefore, to succeed in establishing its counterclaim and defense inequitable conduct based on these statements, Portola must demonstrate that each statement was a misrepresentation or an omission of a material fact. Because the patent application that resulted in the '259 patent was filed on July 3, 1996, the court looks to the current version of PTO Rule 56. *See Bruno Indep. Living Aids, Inc.* v. *Acorn Mobility Servs., Ltd.*, 394 F.3d 1348, 1352 (Fed. Cir. 2005). Under this version of Rule 56, information is material to patentability when

> it is not cumulative to information already of record or being made of record in the application, and

> (1) It establishes, by itself or in combination with other information, a prima facie case of unpatentability of a claim; or

> (2) It refutes, or is inconsistent, with a position the applicant takes in;

>> (i) Opposing an argument of unpatentability relied on by the Office, or

>> (ii) Asserting an argument of patentability.

*Id.*, quoting C.F.R. § 1.56 (2004). Portola then must establish that Blackhawk intended to deceive the PTO. "While the intent to deceive may be inferred from the surrounding circumstances rather than by direct evidence, the intent necessary to establish inequitable conduct is based on a sliding scale related to the materiality of the omission." *Abbot Labs.*, 300 F.3d at 1380, *citing Critikon, Inc.* v. *Becton Dickinson Vascular Access, Inc.*, 120 F.3d 1253, 1256 (Fed. Cir. 1997).

In support of its defense of inequitable conduct, Portola's argues that Roche's statements, when considered either independently or in the aggregate, were highly material and offered with the intent to deceive the PTO Examiner because they were submitted to overcome both the PTO Examiner's rejection of the patent application of the claimed invention and the public use

22

proceedings. This argument purports to address why Blackhawk submitted the statements, but it is not evidence that the statements established a prima facie case of unpatentability or that the statements refuted or were inconsistent with a position taken by Blackhawk in opposing an argument of unpatentability relied on by the PTO or in asserting an argument of patentability. Additionally, "[d]uring prosecution, an applicant may submit objective factual evidence to the PTO in the form of patents, technical literature, and declarations under 37 C.F.R. § 1.132 (2003) submitting expert testimony and, at times test data." *CMFT, Inc. v. Yielup Int'l Corp.*, 349 F.3d 1333 at 1342 (Fed. Cir. 2003). There is no indication that Roche's statements fall into any of these categories, and they were unaccompanied by, and not asserted to be supported by, any factual evidence. They appear to be nothing more than attorney argument, which "is not the kind of factual evidence that is required to rebut a prima facie case of obviousness." *Id., quoting In re Geisler*, 116 F.3d 1465 (Fed. Cir. 1997). As such, Portola has failed to establish the materiality of these statements. For the sake of completeness, however, the court will consider each statement in turn.

### A. Yoshida Patent

First, Portola argues that Blackhawk's statement regarding the reattachability of the label of the Yoshida patent was presented as fact and false. The Yoshida patent was considered by the PTO Examiner during the course of the patent prosecution. In fact, the PTO Examiner, initially rejected the claims of the application on which the '259 patent is based as obvious in view of the Yoshida patent in Paper Number 4, which was mailed on September 19, 1997. On March 18, 1998, Mr. Roche responded to the PTO Examiner's initial rejection on behalf of Walter and Douglas Hidding. In this response, Roche stated, "If one were to attach a label to a cap using the hot-melt resin or adhesive suggested by Yoshida, the stickiness of the hot melt resin or adhesive would allow the label

23

to be placed back on the cap after the container has been tampered with."

During a deposition taken of Roche in 2004, he was asked whether a hot-melt resin would be considered sticky when it was solidified. Roche responded that it "[d]epends on the type of polymer that's used in the resin." Portola Ex. 32 at 10. Roche then was asked whether he could tell by the use of hot-melt resin alone whether it would be sticky at room temperature. Responding, Roche stated, "No, I think it would depend on the polymer in the resin." *Id.* Portola's expert, Theron Downes, also has stated in his report that "[a] label attached to a cap with a hot melt resin or adhesive is not necessarily reattachable to the cap." Portola Ex. 24 at 19. Such evidence calls into question the precise accuracy of Roche's March 1998 statement but does not necessarily make his statement false.

Additionally, the Yoshida patent does not specify any particular hot melt resin or adhesive. And, as pointed out by Blackhawk, Roche also stated during his deposition in reference to the phrase "hot melt resin or adhesive" in the Yoshida patent, "I see the word adhesive there. So that makes me think it will stick. Portola Ex. 32 at 11. After language in the Yoshida patent referencing the "inherent stickiness of the fluid resin" was called to his attention, Roche stated further, "If there is a stickiness[,] I think something could be re-attached to something else." *Id.* at 43. In the absence of evidence demonstrating that the hot melt resin or adhesive contemplated by the Yoshida patent would preclude the label from being reattached to the bottle cap, Portola cannot demonstrate that Roche's statement regarding the Yoshida patent was clearly incorrect. Moreover, the fact that Blackhawk was attempting to distinguish its claimed invention from prior art does not constitute a material omission or misrepresentation because the Yoshida patent was before the PTO Examiner, considered by the PTO Examiner, and the PTO Examiner was free to reach his own conclusions

24

regarding the claimed invention on the art before him. *Akzo N.V.* v. *U.S. Int'l Trade Comm'n*, 808 F.2d 1471, 1482, (Fed Cir. 1986), *cert. denied*, 482 U.S. 909, 96 L. Ed. 2d 382, 107 S. Ct. 2490 (1987). Therefore, the court cannot find that Roche's statement regarding the Yoshida patent rises to the required "threshold level of materiality" or is false. *See PerSeptive Biosystems, Inc.* v. *Pharmacia Biotech, Inc.*, 225 F.3d 1315, 1319 (Fed. Cir. 2000); *see also Hoffmann-La Roche, Inc.* v. *Promega Corp.*, 323 F.3d 1354, 1359 (Fed. Cir. 2003) ("Inequitable conduct requires *misrepresentation* or omission *of a material fact*, together with an intent to deceive the PTO.") (emphasis added).

## B.  Liqui-Box Label

1.  Induction vs. Conduction Heating

During its prosecution of the '259 patent, Blackhawk distinguished the Liqui-Box cap from the claimed invention on the basis that the claimed invention calls for "a plastic, non-metallic tamper-indicating membrane that is attached and sealed to the top face of the cap by way of a heat seal band . . . ." Portola Ex. 6 at 1004. By contrast, Blackhawk represented that the Liqui-Box cap

> includes a "metallized" or "foil" label that is attached to the cap of [the] water bottle by way of an induction heating process.

> [T]he use of a plastic, non-metallic membrane allows the membrane to be heat sealed to the cap, unlike the [Liqui-Box cap] . . . which requires a metallized or foil label because of the induction heating process used to attach the label to the cap.

Portola Ex. 6 at P1004-05. Blackhawk does not dispute that these statements are inaccurate in that the Liqui-Box label is attached by direct conduction, as opposed to indirect induction, heating. Blackhawk asserts, however, that because it submitted a communication on August 26, 1998, which affirmatively stated that Blackhawk did not dispute the facts about the Liqui-Box cap as set forth in Portola's declarations and acknowledged the Liqui-Box cap as prior art, the misstatements were

25

immaterial.[10] The claims of the '259 patent as prosecuted and as issued calls for a "heat seal" without specifying whether that seal is formed by induction heating or conduction heating. Rather, the claims of the '259 patent focus on the material used in the label: "a plastic, non-metallic tamper-indicating membrane." Portola Ex. 6 at P1004. While Blackhawk distinguished its invention from the Liqui-Box product on its incorrect assumption that the Liqui-Box label was applied through conduction heating, the primary basis of distinction raised by Blackhawk was the Liqui-Box cap's use of a "metallized" or "foil" label. Portola Ex. 6 at P1004. As a result, the type of heat seal used by Liqui-Box was not the sole impetus for the PTO Examiner to allow the claim over the prior art, as argued by Portola. Additionally, the Liqui-Box cap and its literature were brought before the PTO Examiner, who was able to examine the prior art after it was disclosed and assess the veracity of Blackhawk's statements. Therefore, Portola has not established that the misstatements meet even the minimum threshold of materiality

   2.   Metallic Metals

Portola also bases its inequitable conduct defense on Blackhawk statement that "[i]t is well known that the use of metallic materials in a label makes it difficult to print information on the label." Portola argues that Blackhawk did not know whether it was more difficult to print on metallic materials but that Roche presented this statement as fact rather than opinion. This argument also fails for a number of reasons.

---

[10] Among the declarations submitted by Portola with its Petition for Public Use was the declaration of Ross Markley, Portola's Vice-President of Sales, in which he explained the non-reattachability feature of the Liqui-Box product, as was explained to him by a Liqui-Box representative. Portola Ex. 5 at 954. Specifically, he states, "This cap for a water bottle has a foil label which was attached thereto by heat conduction. The characteristic of the material applied to the underside of the label is that it permits the label to be adhered by heat to the cap but once the label is removed from the cap it cannot be reattached either to the cap or to the bottle or any other surface." Id. at 955.

First, Portola has not established that this statement is false. Portola relies on the deposition of Henry Mider, the head of Blackhawk's printing department, for the proposition that he did not know whether it was more difficult to print on metallic materials. *See* PSF Invalidity ¶ 89. The deposition transcript reveals, however, that Mr. Mider was shown metallized material and asked whether he had any opinion as to whether it would be easy or difficult to print on that particular material. Portola Ex. 31 at 48. Mr. Mider responded, "I see no problem, no." *Id.* at 49. Mr. Mider was then asked whether he thought that there would be any problem printing on that material as compared to any other material. *Id.* Mr. Mider responded, "Again, you'd have to test it. I don't know if ink would stick to that or not, would adhere to that or not." *Id.* He was also asked about whether he had an opinion as to whether it would be easier to print on the Kleen-Peel label or defendant's exhibit 6. *Id.* at 50. Mr. Mider said "No." *Id.* at 51. As is evident from this testimony, Mr. Mider offered no opinion contrary to the assertion that "it is well known that the use of metallic materials in a label makes it difficult to print information on a label" or that printing on a metallized label is "more difficult." Moreover, the entire line of questioning was focused on particular metallic materials rather than on the more general proposition that printing on metallic materials is difficult or more difficult.

Second, Blackhawk has offered the uncontroverted testimony of both Douglas Hidding and Roche that printing on metal and metal surfaces is difficult. While a preface to the statement indicating that the assertion was in some way opinion rather than fact may have provided greater clarity, the issue is not whether such an alternative statement would have been truthful. Here, the issue is whether Blackhawk's statement was false, and Portola has failed to establish that the statement was in fact false. *See Gen. Electro Music Corp.* v. *Samick Music Corp.*, 19 F.3d 1405 at

27

1410 (Fed. Cir. 1994) ("The issue is not whether an alternative statement would have been truthful, but whether . . . [the] actual statement . . . was false."). There is also no evidence to suggest that had Blackhawk stated that, in its opinion, printing on metallic materials is difficult or more difficult or that such information would have established a prima facie case of unpatentability or refuted or was inconsistent with Blackhawk's position.

3.    The "Discovery"

The final statement raised by Portola in support of its defense of inequitable conduct also relates to Blackhawk's attempt to distinguish its claimed invention from the Liqui-Box cap. Blackhawk stated, "It has been discovered that the seal obtained by the heat sealing process used in the present invention provides for a stronger seal than produced by the induction heating process used in the [Liqui-Box cap]." PSF Invalidity ¶ 80. Blackhawk's declaration was inaccurate. Blackhawk had not performed any comparative testing of the strength of its seal versus the Liqui-Box seal. PSF Invalidity ¶ 85. At his deposition, Douglas Hidding also offered the opinion that an inductive seal and conductive seal are comparable. Portola Ex. 30 at 145-47. Finally, as discussed previously, the Liqui-Box cap used conduction heating, rather than induction heating, to form the seal. Nevertheless, the evidence is insufficient to persuade the court that this statement was a material misrepresentation or that Blackhawk possessed the requisite intent to deceive the PTO.

The Federal Circuit's recent decision in *Purdue Pharma L.P.*, v. *Endo Pharmaceuticals Inc.*, --- F.3d ----, 2006 WL 231480 (Fed. Cir. Feb. 1, 2006), is instructive. In *Purdue*, the patentee of three patents for pain medications stated repeatedly to the PTO,

> It has now been *surprisingly discovered* that the presently claimed controlled release oxycodone formulations acceptably control pain over a substantially narrower, approximately four-fold [range] (10 to 40 mg every 12 hours -- around-the-clock dosing) in approximately 90% of patients. This is in sharp contrast to the

28

> approximately eight-fold range required for approximately 90% of patients for opioid analgesics in general.

2006 WL 231480, at *2 (emphasis in original). As explained by the Federal Circuit, the thrust of this language was that the invented formulation using a four-fold range of dosages achieved the same clinical results as the prior art using an eight-fold range of dosages. *Id.* At the time that the patentee made this claim, however, it had no clinical evidence to support the assertion. In fact, at no time prior to the issuance of the patent, did the patentee have clinical evidence supporting the assertion. This was because the assertion was based only on an inventor's "insight" rather than on experimental results. 2006 WL 231480, at *5. Additionally, during the prosecution of this patent, the PTO examiner rejected the applications on the grounds that the invention was obvious in light of prior art. After one such rejection, the patentee submitted a response accompanied by the declaration of an inventor of two of the patents. The declaration included an attachment that further suggested that the "discovery" was supported by clinical evidence. 2006 WL 231480, at *6. In response to the applicant's additional explanations, the PTO examiner eventually allowed the claims. 2006 WL 231480, at *5.

In light of this evidence, the Federal Circuit determined that the trial court's finding that patentee failed to disclose material information was not clearly erroneous, reasoning that the "surprising discovery" was a key argument raised consistently and repeatedly by the patentee during prosecution to overcome prior art cited by the examiner. 2006 WL 231480, at *7. Moreover, the patentee did not present the four-fold dosage range as a general benefit of the claimed formulations but relied on the four-fold dosage range to distinguish its invention over other opioid analgesics in precise, quantitative terms. 2006 WL 231480, at *8. The Federal Circuit emphasized, however, that this case was "an usual one," explaining that "[a] failure to inform the PTO whether a 'surprising

29

discovery' was based on insight or experimental data does not in itself amount to a material omission." 2006 WL 231480, at *9. Even after finding that this omission was material, the court stressed that the level of materiality was not especially high because the patentee had not expressly misrepresented to the PTO that it had obtained experimental results. *Id.* "Instead, [the patentee] made statements implying that an empirical basis existed for its discovery and then failed to disclose that the discovery was based only on insight." *Id.*

Like the patentee in *Purdue Pharma*, Blackhawk represented that a "discovery" had been made when this "discovery" was based only on the insight and experience of Douglas Hidding, or counsel's misunderstanding of this experience, rather than on any testing or experiment. *See* BSF Invalidity ¶¶ 20-23.[11] Blackhawk, however, did not quantify how much stronger a seal was created by the heat sealing process in the claimed invention than the process used in the Liqui-Box cap. Blackhawk's language was vague, imprecise, and unsupported by any declarations or affidavits, unlike the statement at issue in *Purdue Pharma*. Moreover, Blackhawk did not represent that any particular test or procedure had been performed. *Cf. Hoffmann-La Roche, Inc.*, 323 F.3d 1354 (upholding finding of inequitable conduct where patentees erroneously stated in the written patent description that they had performed a particular procedure and had obtained certain results when no such procedure had been performed); *Digital Control, Inc. v. Charles Mach. Works*, --- F.3d ----, 2006 WL 288075 (Fed. Cir. 2006) (finding material an inventor's misstatements, which were

---

[11]Portola raises various objections or lacks sufficient information to admit or deny these paragraphs. The evidence cited by Blackhawk's is consistent with its stated facts, and the court does not see any inconsistencies between the various assertions. Additionally, an objection based on the lack of information is improper under the Local Rules, admits that Portola cannot refute evidence offered by Blackhawk. *See, e.g., Karazanos v. Madison Two Assocs.*,147 F.3d 624, 626 (7th Cir. 1998) (stating that such an "equivocation is an admission, not a denial"). Accordingly, the facts contained within the cited paragraphs are deemed admitted. Therefore, the court has accepted Blackhawk's stated facts and overrules Portola's objections.

included in an affidavit with the purpose and effect of preserving the patent application, describing his reduction to practice of his claimed invention when he had not performed any such test). This statement is a general assertion of the benefits of conduction sealing rather than induction sealing. As such, it does not constitute a material misstatement of fact or a material omission.

Even assuming that Portola met the minimum threshold for establishing the materiality of these misstatements, Portola has not met the high threshold of establishing intent where the relative materiality of these misstatements is low. Intent to deceive cannot be "inferred solely from the fact that information was not disclosed; there must be a factual basis for a finding of deceptive intent." *Hebert* v. *Lisle Corp.*, 99 F.3d 1109, 1116 (Fed. Cir. 1996). When determining whether intent has been shown, a court must weigh all evidence, including evidence of good faith. *Baxter Int'l, Inc.* v. *McGaw, Inc.*, 149 F.3d 1321, 1330 (Fed. Cir. 1998). Although Blackhawk did not disclose the Liqui-Box cap in its original submission to the PTO, Portola brought both the existence of the Liqui-Box cap and its literature to the attention of the PTO Examiner. Blackhawk's Local Rule 56.1(b)(3)(B) Additional Facts on Inequitable Conduct "BSAF Inequitable Conduct" ¶ 4. Blackhawk then submitted a sample of the Liqui-Box cap to the PTO Examiner. BSAF Inequitable Conduct ¶ 7. Thus, the Liqui-Box cap and its literature were brought before the PTO Examiner, who could independently examine the prior art after it was disclosed and assess the veracity of Blackhawk's statements. The record shows also that Douglas Hidding had a good faith belief that the Liqui-Box cap was attached by induction heat sealing based on his experience with induction sealing. *See* BSAF Inequitable Conduct ¶¶ 13-15.[12] Finally, Blackhawk's August 26, 1998

---

[12]Portola states that it lacks sufficient information to verify the truth or falsity of the claims made in BSAF Inequitable Conduct ¶¶ 14 and 15 and therefore refutes the same. The court rejects this argument. *See, supra*, note 14.

communication established that Blackhawk did not dispute that the Liqui-Box cap constituted prior art and that Blackhawk did not dispute the facts which were stated in the various declarations included with the Petition to Institute a Public Use Proceeding. Therefore, Portola has failed to show by clear and convincing evidence that the requisite intent was present in this case.

Because there is no genuine issue of material fact and because Portola has failed to meet its burden of establishing the materiality of Blackhawk's statements, the court grants Blackhawk's motion for summary judgment and denies Portola's motion for summary judgment on Portola's defense of inequitable conduct.

## ORDER

For the reasons stated above, the court grants in part and denies in part Blackhawk's motion to strike [#98], grants Blackhawk's motion for summary judgement on infringement [#73], grants Blackhawk's motion for summary judgment on Portola's defense and counterclaim based on inequitable conduct [#70], denies Portola's motion for summary judgment on infringement, invalidity, and unenforceability [#63]. Remaining for trial is Portola's claim of invalidity. The case is set for a status hearing on March 30, 2006 at 9:30. In the meantime, the parties are directed to endeavor to discuss the possibility of settlement and to report to the court at the status hearing.

ENTER:

JOAN HUMPHREY LEFKOW
United States District Judge

Dated: March 14, 2006